# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**JEREMY M. BLANK,**
      **Plaintiff,**

**v.**
                                    **Case No.  18-C-141**

**KENECHI ANULIGO, *et al.*,**
      **Defendants.**

---

## ORDER

Jeremy Blank, a Wisconsin state prisoner who is representing himself, filed a lawsuit under 42 U.S.C. § 1983, alleging that defendants violated his civil rights. I allowed plaintiff to proceed with the following claims: (1) that Doctor Kenechi Anuligo, Nurse Amanda Set-Sporleder, Nurse Beverly Weber, Nurse Carrie Brouillette, and Sergeant Manthey showed deliberate indifference towards a painful growth on his neck; and (2) Winnebago County and/or Correct Care Solutions implemented a "custom or policy" at Winnebago County Jail that prohibited inmates from receiving prescription-grade pain medication. ECF No. 66 at 3; *see also* ECF No. 75. This order resolves defendants' motions for summary judgment, defendants' motion to restrict document, and plaintiff's motion for leave to file supplemental memorandum of law. ECF Nos. 82, 89, 97, and 129.

On March 25, 2019, defendants Anuligo, Set-Sporleder, Weber, Brouillette, and Correct Care Solutions filed a motion to restrict documents (Exhibits A-C) to case participants only. ECF No. 97. Exhibit A is copy of plaintiff's medical records documenting the full care he received at the Winnebago County Jail. ECF No. 97-1. Exhibit B is copy of plaintiff's medication administration records documenting his

medication pass encounters with nursing staff at the Winnebago County Jail. ECF No. 97-2. Exhibit C is a copy of plaintiff's medical records from Dr. Christopher Keller and his colleagues documenting the medical care plaintiff received at ENT Specialists of Wisconsin. ECF No. 97-3.

Before I restrict any part of the record, I must determine whether there is good cause to do so. Gen. L. R. 79(d)(3) (E.D. Wis.). "A [party's] general interest in keeping medical information private does not necessarily override the public's interest in having access to that information." *Walker v. McArdle*, 2019 WL 1980357, at *1 (E.D. Wis. May 2, 2019). "[W]hile many litigants would prefer that [] private medical information be kept from the public, that preference, without more, is insufficient to overcome the long-standing tradition that litigation be open to the public." *Id.*

I appreciate defendants' attempt to protect plaintiff's medical records, but plaintiff placed his own medical condition at issue in this case. The public has a right to access this decision and order, along with the evidence upon which I relied. Given that defendants seek to restrict essentially *all* evidence relevant to this case, I must deny their motion to restrict documents. In the future, defendants should consider limiting their request to only that information which is truly sensitive. *See e.g.*, *Young v. Blozinski*, 2018 WL 4964612, at *3 (E.D. Wis. Oct. 15, 2018) (granting defendants' request to seal plaintiff's medical records related to his history of sexually transmitted diseases.)

On October 21, 2019, plaintiff filed a motion for leave to file supplemental memorandum of law, along with his proposed supplemental memorandum of law. ECF No. 129. Defendants did not oppose the motion. Therefore, I will grant plaintiff's motion

and will consider his proposed supplemental memorandum of law in the analysis below. *See* Civ. L. R. 7(d) ("Failure to file a memorandum in opposition to a motion is sufficient cause for the Court to grant the motion.")

**FACTS**

For approximately two months in December 2017 and January 2018, plaintiff was an inmate at the Winnebago County Jail. Blank Dec., ECF No. 110, ¶ 1. Defendants are Doctor Kenechi Anuligo, Nurse Amanda Set-Sporleder, Nurse Beverly Weber, Nurse Carrie Brouillette, Sergeant Manthey, Winnebago County, and Correct Care Solutions. ECF No. 90, ¶ 2; *see also* ECF No. 127.

Plaintiff arrived at the Winnebago County Jail on December 2, 2017. Blank Dec., ECF No. 110, ¶ 2. At that time, he noticed a small lump under his chin, but he didn't request "immediate" medical attention. *Id.* Plaintiff explains that he knew from past experience that he would receive a physical within two weeks of being booked. *Id.*

The following week, on December 14, 2017, Nurse Set-Sporleder performed plaintiff's physical exam. *Id.*, ¶ 4. Plaintiff showed her the lump under his chin and explained his "symptoms." *Id.* Set-Sporleder told plaintiff that she would put him on the "list" to see the doctor the following week. *Id.* She also told plaintiff to notify the deputies if his condition worsened. *Id.* At that time, plaintiff's lump was "the size of a golf ball." *Id.*

Several hours later, at around 1:00 a.m. on December 15, 2017, plaintiff stopped Deputy Wuest during "rounds." ECF No. 127, ¶ 2. Plaintiff told Wuest that he was "experiencing unbearable pain and trouble breathing…that was worse when lying down and almost asleep." ECF No. 130, ¶ 3. Plaintiff further explained he had seen a nurse during evening medication pass, and the nurse told him to notify a deputy if his

condition changed or worsened. ECF No. 127, ¶¶ 4-5.  After talking to plaintiff, Deputy Wuest told Sergeant Manthey about plaintiff's symptoms. *Id.*, ¶¶ 6-7. Manthey instructed Wuest to take plaintiff's vitals and to contact the on-call nurse/doctor for further instructions, both of which Wuest did. *Id.*, ¶¶ 8-10.

A short time later, Wuest talked to the on-call nurse, who connected him to Doctor Anuligo. *Id.*, ¶¶ 11-15. Wuest told Anuligo about plaintiff's symptoms: a swollen lump under his chin, tightness in his throat, pain in his chest and neck, and a sharp pain in his ears. *Id.*, ¶ 13. He also told Anuligo that plaintiff self-reported a history of asthma and cysts. *Id.*, ¶¶ 14-15.

Based on the information Wuest provided, Anuligo concluded that plaintiff was likely suffering from a joint or muscle issue in his jaw, neck, and throat area. ECF No. 90, ¶ 31. Anuligo ruled out any "emergency" medical condition based on Wuest's description of plaintiff's physical state, plaintiff's medical history, and plaintiff's "normal" vitals. *Id.*, ¶ 32. Anuligo believed plaintiff's pain and difficulty swallowing were likely a physical manifestation of the joint or musicale issue in his jaw, neck, and throat. *Id.*, ¶ 33. He prescribed two 324 mg Aspirin, "monitoring" throughout the remainder of the night/morning, and re-evaluation of plaintiff in the morning. *Id.*, ¶ 34; *see also* ECF No. 127, ¶¶ 17-19, 26. Plaintiff received the treatment as prescribed. *See* ECF No. 92-2 at 1. Deputy Wuest then filled out an incident report, which Manthey signed. ECF No. 127, ¶ 23. Manthey then filled out a physical medical notification form and sent it to the Health Services Unit. *Id.* Manthey returned to his normal duties and had no other personal interactions with plaintiff that morning. *Id.*, ¶¶ 20-21.

Later in the morning, on December 15, 2017, plaintiff filed an Inmate Request Form regarding the lump on his chin. *Id.*, ¶ 24. Manthey denied the request because plaintiff had received "triage" treatment earlier in the morning and was already scheduled to see a nurse later in the morning. *Id.*, ¶¶ 26-28. Manthey responded,

> "You were provided with medical attention on 3rd shift with the on call nurse and doctor. You are not being denied medical care, you just disagree on the course of action that was taken. Your request is denied."

ECF No. 84-3.

Later that morning, on December 15, 2017, Nurse Set-Sporleder examined plaintiff. ECF No. 90, ¶ 39. Set-Sporleder took plaintiff's vitals and noted that his oxygen levels were at 100% and his pulse was fine. *Id.*, ¶ 41. Plaintiff explained that he had "unbearable pain and trouble breathing that was worse when lying down almost asleep." ECF No. 110, ¶ 6. Plaintiff explained that in the past, his oxygen level dropped while asleep. *Id.*, ¶¶ 6-7. He explained that he was afraid that he may die if he went to sleep. *Id.*, ¶ 6. Plaintiff broke down in tears and insisted that he use the o2 monitor to show Set-Sporleder what he was talking about. *Id.*, ¶¶ 6-8. Set-Sporleder denied the request and simply stated that it was "normal" for him. *Id.*, ¶¶ 7-8.

Set-Sporleder then performed a physical exam and noted that plaintiff had a "hard mass" on his neck that was "not tender to touch." ECF No. 90, ¶ 42. She called Anuligo with information from the physical exam. *Id.* Anuligo, again, ruled out an emergency condition. *Id.*, ¶¶ 43-44. He believed that plaintiff may have been suffering from an infection that caused swollen lymph nodes. *Id.* He ordered 400 mg Ibuprofen and scheduled plaintiff for an in-person exam the next time he was at the facility, on December 20, 2017. *Id.*, ¶ 44.

The following day, on December 16, 2017, plaintiff filed a "sick call" request regarding continued pain in his throat. *Id.*, ¶ 47. Nurse Weber responded by placing plaintiff on the list to be seen by Anuligo at the next available appointment. *Id.*, ¶¶ 48-49. Later that day, plaintiff filed a second Inmate Request Form alleging that Manthey had improperly handled his first Inmate Request Form from the prior day. ECF No. 127, ¶ 30. In response, Manthey gave plaintiff a grievance form. *Id.*, ¶ 31. Plaintiff submitted his grievance form on December 17, 2017. *Id.*, ¶ 32. Lieutenant Lichtensteiger denied the grievance form, noting that Manthey was following Anuligo's medical orders. *Id.*, ¶¶ 32-33.

On December 20, 2017, Anuligo and Weber examined plaintiff. ECF No. 90, ¶¶ 54-55. According to Anuligo's progress notes, plaintiff complained of pain and lumps in his throat that made it difficult to swallow. *Id.*, ¶ 56. Anuligo noted that plaintiff's throat was soft and tender. *Id.* Anuligo, again, ruled out an emergency medical condition because plaintiff's vitals and physical exam were "normal." *Id.* He continued to believe that plaintiff had an infection. *Id.*, ¶¶ 56-57, 59. He ordered an x-ray and an ultrasound to confirm his diagnosis. *Id.* He also suspected that plaintiff's complaints of trouble swallowing and breathing were a physical manifestation of the lumps on his throat, which he would treat with pain and anti-inflammatory medication. *Id.*, ¶ 58. He ordered 800 mg ibuprofen and 650 mg Tylenol for pain. *Id.*

The following day, on December 21, 2017, plaintiff received an x-ray and ultrasound. *Id.*, ¶ 60. Doctor William Betz (an outside doctor) reviewed the x-ray results and issued a report which stated, "There is no radiographic evidence of acute disease in the soft tissues of the neck." *Id.*, ¶ 61. Doctor Michael Hinz (also an outside doctor)

reviewed the ultrasound results and issued a report which stated, "Three masses are seen. These could be lymph nodes." *Id.*, ¶ 62.

After reviewing these reports, Anuligo entered a treatment order for "reactive lymphadenopathy," the swelling of lymph nodes caused by the body fighting off an infection. *Id.*, ¶ 63. He prescribed Clindamycin, an antibiotic specifically used to treat lymphatic-related infections. *Id.* He also recommended that an outside Ear Nose Throat (ENT) doctor examine plaintiff if his condition did not improve. *Id.*, ¶ 64. Plaintiff received his medication as prescribed between December 20, 2017 and December 25, 2017. *Id.*, ¶ 68.

On December 26, 2017, plaintiff submitted a "sick call" request stating that he was experiencing his symptoms again. *Id.*, ¶ 69. In response, Set-Sporleder examined plaintiff the following day, on December 27, 2017. *Id.*, ¶ 70. According to her progress notes, plaintiff's swelling and pain returned and his throat lumps were "tender to touch." *Id.* Set-Sporleder called Anuligo, who told her to schedule plaintiff for an appointment with a private ENT. *Id.*, ¶ 71.

About a week later, on January 4, 2018, Doctor Christopher Keller from the ENT Specialists of Wisconsin examined plaintiff. *Id.*, ¶¶ 72-73. Keller concluded that plaintiff had "submental lymphadenitis," an infection that was causing swelling in his lymphatic system. *Id.*, ¶ 73. He recommended antibiotics and a follow-up appointment in one week. *Id.* Consistent with that recommendation, Anuligo prescribed antibiotics twice a day for ten days, ibuprofen for ten days, and a probiotic. *Id.*, ¶ 74. Plaintiff received all of his medication as prescribed. *Id.*, ¶ 75.

On January 11, 2018, plaintiff went to his one-week follow-up appointment with Doctor Keller. *Id*., ¶ 76. Keller noted that plaintiff's throat was "still sore and swollen." *Id*. Keller then concluded that plaintiff had a "submandibular abscess." *Id*. Keller drained the abscess with a needle and recommended that plaintiff continue with the medication Anuligo had prescribed. *Id*. He also requested that plaintiff return in one week for a follow-up appointment. *Id*. Consistent with Keller's recommendation, Anuligo re-prescribed the anti-biotic and probiotic. *Id*., ¶ 77. He also ordered that nursing staff change plaintiff's dressing regularly. *Id*.

On January 16, 2018, plaintiff went to his follow-up appointment. *Id*., ¶ 78. Doctor Robert Prehn performed a physical exam and recommended that nursing staff remove plaintiff's dressings in two days. *Id*. He also requested a follow-up appointment in one week. *Id*. Consistent with Prehn's recommendation, Anuligo approved the plan to remove dressings and scheduled a follow-up appointment for January 25, 2018. *Id*., ¶¶ 79, 83.

On January 22, 2018, plaintiff submitted a "sick call" request for a CT scan. *Id*., ¶ 81. Nurse Weber denied the request because a specialist had already examined and treated plaintiff. *Id*. Plaintiff transferred out of the Winnebago County Jail the following day, on January 23, 2018. *Id*., ¶ 82. At that time, jail medical staff made sure to inform the new facility that plaintiff had an upcoming appointment with Doctor Keller. *Id*., ¶ 83.

**DISCUSSION**

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). When considering a motion for summary judgment, the court takes evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

"[T]he Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The court performs a two-step analysis,

"first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Id.* at 727–28 (citing *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)).

"The requirement of subjective awareness tethers the deliberate-indifference cause of action to the Eighth Amendment's prohibition of cruel and unusual punishment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). "[T]he court looks into [a prison official's] subjective state of mind." *Petties*, 836 F.3d at 728. A plaintiff need not show that the official intended harm or believed that harm would occur, but mere negligence is not enough. *Id*; *see also Whiting,* 839 F.3d at 662 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.") Even objective recklessness, failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known, is insufficient to make out a claim. *Petties*, 836 F.3d at 727. Instead, a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm. *Id.*

In the prison medical care context, medical care providers show deliberate indifference by: (1) ignoring a request for medical assistance; (2) refusing to take instructions from a specialist; (3) persisting in a course of treatment known to be ineffective; (4) choosing an easier and less efficacious treatment without exercising medical judgment; and (5) delaying in treatment which serves no penological interest. *Petties*, 836 F.3d at 729-31. The court examines the totality of an inmate's medical care in analyzing deliberate indifference. *See Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th

Cir. 1997); *see also Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (internal citations omitted) ("We must examine the totality of an inmate's medical care.")

Because neither party raised the issue, I will presume for purposes of summary judgment that plaintiff's medical condition was an "objectively" serious medical condition.

Regarding "subjective" deliberate indifference, defendants Anuligo, Set-Sporleder, Weber, and Brouillette assert that they provided plaintiff with consistent medical care for the lump on his chin. They argue that they responded to all of plaintiff's medical requests, examined plaintiff in person numerous times, prescribed antibiotics, Tylenol, and Ibuprofen (all which plaintiff received), ordered an x-ray and ultrasound which were reviewed by Dr. Betz and Dr. Hinz, sent plaintiff to see ENT specialist Dr. Keller, followed Dr. Keller's recommendations, and scheduled several different follow-up appointments with Dr. Keller's office until the lump on plaintiff's chin healed. *Id.* Plaintiff does not dispute the treatment he received for the lump on his chin. *See* ECF No. 108. Instead, plaintiff raises issue with the alleged failure to treat his "breathing and severe constant pain." *Id.* at 2. He notes that Nurse Set-Sporleder denied his request to use an o2 machine to confirm his breathing problems and Anuligo failed to prescribe stronger medication to treat his constant pain.

Anuligo explains that plaintiff's breathing problems and constant pain were likely caused by the lump on plaintiff's chin, which he was already treating with antibiotics, Tylenol, and Ibuprofen. He notes that every other doctor that reviewed plaintiff's file (Dr. Betz, Dr. Hinz, Dr. Keller, and Dr. Phren) agreed with and/or confirmed his diagnosis of a lymph node infection and recommended that plaintiff continue with the medication

Anuligo had already prescribed. Plaintiff's appears to disagree with Anuligo's diagnosis and implies that something else caused his breathing problems and constant pain, but plaintiff has no basis in fact to challenge Anuligo's diagnosis. Plaintiff is not a medical expert himself and no other doctor that reviewed his file arrived at that conclusion. Plaintiff's disagreement with Anuligo's treatment plan and medical judgment is not enough to establish deliberate indifference. See *Chadwick v. Walker*, 365 F. App'x 687, 690 (7th Cir. 2010) ("[D]isagreement with the exercise of medical judgment does not state a claim for deliberate indifference.")

Plaintiff implies that Anuligo "persisted in a course of treatment known to be ineffective" because he re-prescribed the same antibiotics and pain medication several times. Anuligo did so, however, based on Dr. Keller's recommendation. *See McGhee v. Suliene*, No. 13-CV-67-BBC, 2014 WL 576150, at *9 (W.D. Wis. Feb. 12, 2014) ("In any event, it is difficult to see how [defendant] could be blamed for not identifying plaintiff's need for surgery as an emergency when she was simply following the recommendations of the specialists that plaintiff saw."). Both Dr. Keller and Anuligo agreed that plaintiff likely had a lymph node infection. They both agreed that antibiotics, Tylenol, and Ibuprofen were the appropriate treatment for that condition. Plaintiff then received the medication both believed were appropriate for that condition. In any event, plaintiff only received the allegedly "ineffective" course of treatment for about three weeks. Three weeks is an entirely reasonable amount of time to wait and see if a treatment plan is "effective." Based on the record, no reasonable jury could conclude that Anuligo, Set-Sporleder, Weber, and Brouillette were deliberately indifferent towards plaintiff's medical condition.

Plaintiff's gripe against Manthey is that Manthey did nothing to investigate plaintiff's complaint. ECF No. 111. The Seventh Circuit has repeatedly held that nonmedical personnel are entitled to defer to the judgment of prison health professionals as long as they do not entirely ignore a prisoner's complaint. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Hayes v. Snyder*, 546 F.3d 516, 527–528 (7th Cir. 2008). If a nonmedical prison official reviews and investigates an inmate's medical complaints and then refers the complaints to the prison's medical provider, that official is not deliberately indifferent. *Greeno v. Daley*, 414 F.3d 645, 655–56 (7th Cir. 2005) ("We do not think [the official's] failure to take further action once he had referred the matter to the medical providers can be viewed as deliberate indifference.").

While plaintiff is correct that Manthey did not investigate plaintiff's medical complaint himself, Manthey delegated that task to Deputy Wuest. See *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job.") Manthey told Deputy Wuest to take plaintiff's vitals and speak to the on-call nurse/doctor for further instructions, which Wuest did. Manthey and Wuest then gave plaintiff the treatment the medical care professionals prescribed.

Manthey did deny plaintiff's inmate grievance filed December 15, 2017. However, plaintiff had already received triage treatment for his condition several hours before and he already had an appointment scheduled for several hours later. Plaintiff notes that "Manthey's decision to not issue [] a grievance form amounts to a departure [from] grievance policy." ECF No. 112, ¶ 2. However, "[a]lleged violations of jail grievance

procedures state no claim under § 1983." *Mann v. Adams,* 855 F.2d 639, 640 (9th Cir.1988), *cert. denied,* 488 U.S. 898 (1988); *see also Furrow v. Lappin*, 393 F. App'x 398, 399 (7th Cir. 2010) ("[T]here is no inherent constitutional right to an effective prison grievance procedure.") Based on the record, no reasonable jury could conclude that Manthey showed deliberate indifference towards plaintiff's medical condition.

Plaintiff does not include evidence or argument regarding any unconstitutional "custom or policy" that Winnebago County and/or Correct Care Solutions implemented. *See* ECF Nos. 108, 111, and 129-1. Therefore, I will grant defendants' motions for summary judgment and dismiss this case.

### CONCLUSION

For the reasons discussed above, **IT IS ORDERED** that defendants' motions for summary judgment (ECF Nos. 82 and 89) are **GRANTED**; defendant's motion to restrict document (ECF No. 97) is **DENIED**; and plaintiff's motion for leave to file supplemental memorandum of law (ECF No. 129) is **GRANTED**.

This order and the judgment to follow are final. A dissatisfied party may appeal this decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. I may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask me to alter or amend my judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil

Procedure 59(e) must be filed within **28 days** of the entry of judgment. I cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. I cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2).

I expect parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 9th day of March, 2020.

s/Lynn Adelman
LYNN ADELMAN
District Judge